Citation Nr: 1518711 
Decision Date: 04/30/15 Archive Date: 05/05/15

DOCKET NO. 94-12 762 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Cleveland, Ohio


THE ISSUES

1. Entitlement to service connection for an acquired psychiatric disorder, to include major depression, dysthymia, and posttraumatic stress disorder (PTSD). 

2. Entitlement to service connection for a cognitive disorder, manifested by memory loss, to include as due to undiagnosed illness. 

3. Entitlement to service connection for obstructive sleep apnea and fatigue, to include as due to an undiagnosed illness. 

4. Entitlement to service connection for an additional dermatological disorder, to include as due to an undiagnosed illness. 

5. Entitlement to service connection for a disorder of the cervical spine, to include as secondary to a service-connected disability.

6. Entitlement to an initial compensable rating for recurrent left eye pterygium.

7. Entitlement to an initial evaluation for atherosclerotic heart disease (AHD) in excess of 30 percent prior to September 15, 2006, and 60 percent therefrom.

8. Entitlement to special monthly compensation (SMC).

9. Entitlement to total disability rating due to individual unemployability (TDIU) prior to June 24, 2008.


REPRESENTATION

Appellant represented by: The American Legion


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

M. Scott Walker, Counsel


INTRODUCTION

The Veteran served on active duty from December 1949 to December 1953, and from July 1987 to December 1991, to include service in Southwest Asia during the Gulf War. 

These matters are before the Board of Veterans' Appeals (Board) on appeal from rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Cleveland, Ohio. The appeal ensued in 1993. 

A videoconference hearing was held in February 2001 before the undersigned Veterans Law Judge, sitting in Washington, D.C. A copy of the transcript of that hearing is of record. 

The issues of entitlement to service connection for vision loss, an acquired psychiatric disorder, a disorder manifested by memory loss, sleep apnea, skin disorders (to include scars of the bilateral hands related to service-connected Dupuytren's contracture) and a neck/cervical spine disorder; as well as entitlement to a compensable evaluation for a left eye disorder, were remanded by the Board for further development in July 2013. 

In the same decision, the Board denied the Veteran's claim for entitlement to an initial evaluation in excess of 30 percent for AHD prior to September 15, 2006, and granted entitlement to an initial evaluation of 60 percent from September 15, 2006. The Veteran subsequently appealed that determination to the United States Court of Appeals for Veterans Claims (Court). Per a June 2014 Joint Motion for an Order Partially Vacating and Remanding the Board Decision (Joint Motion), the Board erred in not providing an adequate statement of reasons or bases for its findings regarding the appropriate evaluation for AHD, necessitating a remand for proper consideration of relevant medical evidence, analysis of the appropriate criteria under which to rate the disability, and a determination of whether further development is needed in order to accurately adjudicate the claim. The Joint Motion also noted that consideration of entitlement to SMC and TDIU, prior to June 24, 2008, was warranted in this case. The Joint Motion was granted in an Order dated June 26, 2014.

The Veteran's claims for entitlement to service connection for loss of vision, as well as scarring of the bilateral hands, were granted by the RO in an April 2014 rating decision. In a separate July 2013 decision, the Board remanded the issue of entitlement to payment or reimbursement of medical expenses for medical care rendered at a non-VA medical facility on October 21, 2009. This issue has not been returned to the Board by the VA Medical Center in Columbus, Ohio, and is not currently before the Board. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The issues of entitlement to service connection for a cognitive disorder, manifested by memory loss; obstructive sleep apnea and fatigue; and a cervical spine disorder; an initial evaluation in excess of 30 percent for AHD prior to September 15, 2006, and 60 percent therefrom; entitlement to SMC; and entitlement to TDIU prior to June 24, 2008, are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ). VA will notify the appellant if additional action is required on his part.


FINDINGS OF FACT

1. The preponderance of the evidence fails to demonstrate that a dermatological disorder (other than scarring of the hands and left leg, for which service connection is in effect) was incurred in or otherwise related to active service. 

2. The preponderance of the evidence indicates that an acquired psychiatric disorder, MDD, is attributable to service. 

3. Throughout the appeal, the Veteran's left eye pterygium has not been associated with any visual impairment, disfigurement, active conjunctivitis, or any other manifestation.

CONCLUSIONS OF LAW

1. A dermatological disorder (other than scarring of the hands and left leg, for which service connection is in effect) was not incurred in or aggravated by active service, to include as the result of an undiagnosed illness. 38 U.S.C.A. §§ 1101, 1110, 1131 (West 2014); 38 C.F.R. §§ 3.303, 3.304, 3.317 (2014).

2. An acquired psychiatric disorder, MDD, was incurred in active service. 38 U.S.C.A. §§ 1101, 1110, 1131 (West 2014); 38 C.F.R. §§ 3.303, 3.304 (2014).

3. The criteria for an initial compensable rating for left eye pterygium have not been met. 38 U.S.C.A. §§ 1155, 5017 (West 2014); 38 C.F.R. § 4.84a, Diagnostic Codes 6018, 6034, 7800 (2007 and 2014); 38 C.F.R. § 4.7 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. The Duties to Notify and Assist

Initially, the Board notes that VA has a duty to notify and a duty to assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5103, 5103A; 38 C.F.R. §§ 3.159, 3.326(a).

Proper notice from VA must inform the claimant and his representative, if any, prior to the initial unfavorable decision on a claim by the AOJ of any information and any medical or lay evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004); Quartuccio v. Principi, 16 Vet. App. 183 (2002). 

These notice requirements apply to all five elements of a service connection claim (veteran status, existence of a disability, a connection between the veteran's service and the disability, degree of disability, and effective date of the disability). Dingess v. Nicholson, 19 Vet. App. 473 (2006). Information that a disability rating and an effective date for the award of benefits will be assigned if service connection is awarded must be included. Id.

Regarding the Veteran's psychiatric disorder claim, service connection is granted in the following section. As such, any deficiencies with regard to the VCAA for this issue are harmless and non-prejudicial. 

Pertinent to the other issues decided herein, neither the Veteran nor his representative has alleged prejudice with respect to notice, as is required. See Shinseki v. Sanders, 129 S. Ct. 1696 (2009); Goodwin v. Peake, 22 Vet. App. 128 (2008); Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). None is found by the Board. Indeed, VA's duty to notify has been more than satisfied. The Veteran was notified of the criteria for establishing entitlement to service connection and increased ratings pursuant to the claims at issue, on a myriad of occasions, the evidence required in this regard, and his and VA's respective duties for obtaining evidence. These letters accordingly addressed all notice elements, to include the process of determining disability ratings and effective dates if service connection is awarded. The issues were most recently readjudicated in an April 2014 supplemental statement of the case. Nothing more is required in this case.

As for the duty to assist, the Veteran's service treatment records have been obtained. Pertinent post-service medical records have been obtained, to the extent available, and no outstanding records have been identified by the Veteran that have not been sought. The Board therefore finds that no additional evidence, which may aid the Veteran's claims or might be pertinent to the bases of any claim decided herein, has been submitted, identified or remains outstanding, and the duty to assist requirement has been satisfied. 

The duty to assist also includes providing a medical examination or obtaining a medical opinion when such is necessary to make a decision on the claim, as defined by law. See Green v. Derwinski, 1 Vet. App. 121 (1991). Here, the Veteran was afforded a full VA examination (in the appropriate specialties) in December 2013. The examiners, medical professionals, reviewed the Veteran's records, obtained an accurate history in each instance, listened to the Veteran's assertions, and performed examinations in accordance with the rating criteria for the claims on appeal which are decided herein. The examiners provided the Board with sufficient information to rate his disability. Importantly, as to the Veteran's eye disability, there is no evidence to indicate that the Veteran's symptoms have worsened since his most recent examination, or that the examination conducted was in any way inadequate. 

Therefore, the Board finds that the examinations of record are adequate and contain sufficient information to decide each issue addressed herein. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). Moreover, neither the Veteran nor his representative has objected to the adequacy of any of the examinations conducted during this appeal. See Sickels v. Shinseki, 643 F.3d 1362, 1365-66 (Fed. Cir. 2011) (holding that although the Board is required to consider issues independently raised by the evidence of record, the Board is still "entitled to assume" the competency of a VA examiner and the adequacy of a VA opinion without "demonstrating why the medical examiners' reports were competent and sufficiently informed"). 

As there is no indication that any failure on the part of VA to provide additional notice or assistance reasonably affects the outcome of the issues decided herein, the Board finds that any such failure is harmless. See Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

II. Service Connection

In this case, the Veteran claims that he has current diagnoses of a skin disorder, as well as an acquired psychiatric disorder, and that each condition is etiologically-related to his period of active service. With regard to these disorders, the Veteran maintains that they are linked to his service in the Gulf War.

In order to prevail on the issue of service connection on the merits, there must be medical evidence of (1) a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disease or injury. See generally Hickson v. West, 12 Vet. App. 247, 253 (1999).

Pertinent law and regulations make special provisions for a Persian Gulf Veteran who exhibits objective indications of an undiagnosed illness or certain medically unexplained chronic multisymptom illnesses. See 38 U.S.C.A. § 1117, 1118 (West 2014); 38 C.F.R. §§ 3.317 (2014). A Persian Gulf veteran is a veteran who served on active military, naval, or air service in the Southwest Asia theater of operations during the Persian Gulf War, as this Veteran has demonstrated. 38 C.F.R. § 3.317(d).

Acquired Psychiatric Disorder

In this case, the Veteran alleges that he has a current diagnosis of an acquired psychiatric disorder, to include MDD and PTSD, stemming from traumatic in-service events. Specifically, the Veteran contends that witnessing dismembered bodies of Iraqi soldiers, an in-service injury incurred when lifting a machine gun, a sandstorm, and the stress of leadership in wartime resulted in his current diagnoses.

The Veteran's service treatment records do not provide a diagnosis of MDD, PTSD, or any other psychiatric condition. Post-service, however, he has been diagnosed with depression, to include MDD, on several occasions. See VA outpatient treatment reports from February 2001 and November 2003, see also VA examination report from October 2006. 

In conjunction with his claim, he was afforded a VA psychiatric examination in October 2006. At that time, a diagnosis of MDD was provided, and the examiner opined that it was at least as likely as not that this diagnosis was related to the Veteran's service in Desert Storm. In support of that opinion, the examiner noted that the Veteran reported the onset of symptoms in 1991, that the Veteran was exposed to traumatic events during that time, and that his symptoms had persisted to the present.

As such, VA medical evidence dated after the Veteran was discharged from service indicates that the Veteran has been diagnosed with an acquired psychiatric disorder as a result of stressful incidents he reportedly experienced during service. In this regard, the Board notes that there is significant evidence against this claim, including a December 2013 VA psychiatric examination in which the Veteran did not meet the criteria for a diagnosis of MDD, PTSD, or any other chronic disorder. 

As the evidence of record in this case at least stands in equipoise, entitlement to service connection for an acquired psychiatric disorder, MDD, is warranted.

Skin Disorder

A review of the record reflects that, during the Veteran's active duty periods, he had two cysts removed, one in 1951 and another in 1988, and was treated for various skin complaints, to include acne necrotica and acneform folliculitis in 1988. Shortly before service separation, in November 1991, he was seen for facial skin problems. A history of sun exposure (especially during Desert Storm) was noted. Examination revealed small, hyper-pigmented areas above the left eyebrow and a small erythematous scaly papule of the left infra-orbital area. There was a flat and slightly-hyper-pigmented macule on top of the nose and at the right temple. The Veteran's arms showed slightly hyper-pigmented flat-topped papulae on the left exterior forearm. No specific diagnoses were indicated at that time. At the time of separation in November 1991, the Veteran's skin was found to be normal, and no dermatological defects were reported or observed.

Post-service private and VA records show that the Veteran was diagnosed with skin cancer in the mid 1990's. Hair loss was noted upon VA examination in August 1997 compatible with male pattern baldness. The Veteran also reported that he had had white pustules that occurred on the extremities and scalp. These pustules recurred and bled. Actinic keratoses were observed on the face and trunk. VA treatment records from 2008 reflect continued treatment for skin problems. Following an additional VA examination in 2009, it was noted that the Veteran had a history of a skin rash which "sounds" like actinic keratosis "that have been frozen off of his face." A history of skin cancer was also noted. The examiner did not provide an etiological opinion. 

Following the July 2013 Board remand, the Veteran was afforded a VA dermatological examination in December 2013. It was noted that the Veteran had been diagnosed with alopecia, basal cell carcinoma, and actinic keratosis. However, at the time of the examination, no skin conditions were found. Following a review of the record, the examiner determined that each of the Veteran's prior diagnoses, to include basal skin cancer, actinic keratosis, and hair loss, were less likely than not proximately due to, or related to, the Veteran's military service. Instead, his hair loss, per the examiner, was most likely a manifestation of male pattern baldness. The remaining dermatological conditions were most likely due to chronic sun exposure over the Veteran's lifetime, and as such, these diagnoses could not be attributed to any specific period of time, in any one location, during that span.

The Board notes that, although the record contains numerous treatment reports documenting ongoing treatment for skin disorders, to include during his military career, not a single medical professional has opined that any such disorder was incurred during service, or that alopecia, keratosis, or basal skin cancer was related to exposure to environmental or toxic agents during his Gulf War service. As the Veteran has confirmed diagnoses for each disorder, the presumptions applicable to Persian Gulf Veterans cannot be applied to establish a nexus.

Lay Evidence

As to the Veteran's assertions that he contracted skin disorders during his period of active service, the United States Court of Appeals for the Federal Circuit (Federal Circuit) held that lay evidence is one type of evidence that must be considered, and competent lay evidence can be sufficient in and of itself. The Board, however, retains the discretion to make credibility determinations and otherwise weigh the evidence submitted, including lay evidence. See Buchanan v. Nicholson, 451 F.3d 1331, 1335 (Fed. Cir. 2006). This would include weighing the absence of contemporary medical evidence against lay statements.

Laypersons are considered competent to provide a medical diagnosis only if (1) the condition is simple to identify (such as a broken leg), (2) he or she is reporting a contemporaneous medical diagnosis, or (3) his or her description of symptoms at the time supports a later diagnosis by a medical professional. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). Here, for example, the Veteran is competent to report symptoms such as skin rashes. However, he is not competent to determine the etiology of a skin disorder caused by a lifetime of sun exposure. 

Unfortunately, there is no medical opinion of record linking these skin disorders to his military service. Further, and as established above, the Veteran is not competent to diagnose, or provide an etiological opinion. While he asserts that his skin disorders began during service, there is simply no record of any report of a chronic dermatological disorder found within the Veteran's service treatment records, despite several instances of acute occurrences.

Instead, post-service medical records only provide evidence against the claim for service connection for a dermatologic disorder, as each condition was diagnosed years after separation with no positive nexus opinion of record linking the onset or etiology of any skin disorder to the Veteran's military service. Moreover, no medical professional has suggested that a skin disorder began during service.

In sum, the competent evidence does not establish that the Veteran's currently-diagnosed skin disorders are related to his periods of active duty in any way. Therefore, the evidence in this case is not so evenly balanced so as to allow application of the benefit-of-the-doubt rule as required by law and VA regulations. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. The preponderance of the evidence is therefore against the claim, and as such it must be denied. 

III. Increased Rating

In this case, the Veteran was awarded service connection for recurrent pterygium, left eye, at a non-compensable rate, effective April 6, 1992. He contends that his left eye disability is more severe than indicated by his current evaluation. To that end, the Board points out that disability evaluations are based upon the average impairment of earning capacity as contemplated by the schedule for rating disabilities. See 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. In order to evaluate the level of disability and any changes in condition, it is necessary to consider the complete medical history of the veteran's condition. See Schafrath v. Derwinski, 1 Vet. App. 589, 594 (2002). However, where an increase in the level of a service-connected disability is at issue, the primary concern is the present level of disability. See Francisco v. Brown, 7 Vet. App. 55 (1994). In cases in which a reasonable doubt arises as to the appropriate degree of disability to be assigned, such doubt shall be resolved in favor of the veteran. See 38 C.F.R. § 4.3. 

VA must assess the level of disability from the date of initial application for service connection and determine whether the level of disability warrants the assignment of different disability ratings at different times over the life of the claim, a practice known as a "staged rating." See Fenderson v. West, 12 Vet. App 119 (1999). The Court has also held that staged ratings are appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). In this case, the evidence of record does not establish additional, distinct time periods wherein the disability on appeal resulted in symptoms that warrant a staged rating.

In general, all disabilities, including those arising from a single disease entity, are rated separately, and all disability ratings are then combined in accordance with 38 C.F.R. § 4.25. However, the evaluation of the same "disability" or the same "manifestations" under various diagnoses is not allowed. See 38 C.F.R. § 4.14. A claimant may not be compensated twice for the same symptomatology as "such a result would overcompensate the claimant for the actual impairment of his earning capacity." Brady v. Brown, 4 Vet. App. 203, 206 (1993) (interpreting 38 U.S.C.A. § 1155). This would result in pyramiding, contrary to the provisions of 38 C.F.R. § 4.14. However, if a veteran has separate and distinct manifestations attributable to the same injury, they should be compensated under different diagnostic codes. See Esteban v. Brown, 6 Vet. App. 259 (1994); Fanning v. Brown, 4 Vet. App. 225, 230 (1993).

During the pendency of the Veteran's appeal, the regulations for evaluating eye and vision disabilities were amended for applications received on or after December 10, 2008. See 73 Fed. Reg. 66,543 (Nov. 10, 2008). As the Veteran's application was received prior to that date, the left eye disability evaluation will be considered pursuant to the former criteria. To be thorough, however, the Board will also examine the evidence of record from December 2008 in light of current criteria.

Prior to December 2008, pterygium was evaluated based on loss of vision, if any. 38 C.F.R. § 4.84a, Diagnostic Code 6034 (2007). After that date, the Board must also look to disfigurement, conjunctivitis, or any other applicable code based on the current findings. In this case, however, loss of vision (acuity and field) in the left eye has been attributed to astigmatism and resulting refractive error, rather than his service-connected pterygium. Therefore, a rating based on loss of vision is not for application. 38 C.F.R. § 4.14.

As noted, pterygium, a benign growth of the conjunctiva, may also be rated as disfigurement under 38 C.F.R. § 4.118, Diagnostic Code 7800. Here, there is no indication of disfigurement of the head, face, or neck. See February 2012 VA examination report. Therefore, evaluation under Diagnostic Code 7800 is not for application in this case. See 38 C.F.R. § 4.14. 

Finally, pterygium may be rated as conjunctivitis under 38 C.F.R. § 4.84a, Diagnostic Code 6018. Under Diagnostic Code 6018, conjunctivitis, if healed, is rated on the basis of residuals; and, if there are no residuals, a non-compensable evaluation is assigned. A maximum 10 percent rating is warranted if there is evidence of active conjunctivitis with objective symptoms. 38 C.F.R. § 4.84a. 

The Board has reviewed all of the evidence in the Veteran's claims file, with an emphasis on the evidence relevant to this appeal. Although the Board has an obligation to provide reasons and bases supporting its decision, there is no need to discuss, in detail, every piece of evidence of record. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (holding that VA must review the entire record, but does not have to discuss each piece of evidence). Hence, the Board will summarize the relevant evidence where appropriate and the Board's analysis below will focus specifically on what the evidence shows, or fails to show, as to the claim.

After review of the record, the Board finds that throughout the appeal the Veteran's left eye pterygium has not been manifested by any residuals, at any time during the period of the appeal, so as to warrant a 10 percent disability rating. 

Turning to the evidence, a June 1992 VA examination noted that the Veteran's corrected vision in the left eye was 20/25. The Veteran was diagnosed with pterygium, left eye, with no recurrence. Astigmatism accounted for refractive error with no link to the left eye diagnosis.

The Veteran was afforded an additional VA examination in conjunction with his claim in October 2006. At that time, it was noted that the Veteran reported for an evaluation for pterygium, left eye, status post removal surgery in the 1960's. He reported a decrease in vision over the last few years, with a significant decrease over the prior three months, bilaterally. He endorsed ocular pain for two weeks, right eye greater than left, as well as floaters in the left eye. He also noted a loss of field of vision, but only in the right eye. His best corrected and uncorrected vision (near) was 20/25 in the left eye. A Goldman visual field test indicated that the left eye was grossly normal with mild overall restriction. Following the examination, the only diagnosis provided for the left eye was pterygium without significant regrowth, and with no effect on astigmatism or visual function.

VA outpatient treatment reports in February and March 2008 indicate a retinal artery embolism, presbyopia (bilateral), pterygium (left), and possible astigmatic corneal changes (left).

Most recently, a VA ophthalmologic examination was conducted in December 2013. It was noted that pterygium was first diagnosed in 1991 after the Veteran returned from the Persian Gulf. His vision was 20/20 at that time, and the pterygium was surgically removed in 2001. The Veteran reported reduced vision in the right, but not the left eye. Other right eye disorders included cataract removal in 2003, a vitrectomy in 2001, and a cyst removal (lower lid) in 2013. The Veteran did not report eye pain, flashes, diplopia, or glaucoma. He also denied redness, swelling, and discharge. Again, reduced vision was only reported in the right eye. Visual acuity in the left eye was 20/80 (uncorrected), and 20/30 (corrected). Goldman was grossly normal in the left eye. 

Following the examination, the Veteran was diagnosed with pterygium, stable, causing no significant increase in astigmatism and no effect on visual function. Mild senile cataract was also diagnosed in the left, though this condition was not linked in any way to the Veteran's disability on appeal. The examiner reiterated that the Veteran's pterygium had been stable since removal in 2001 with no resulting visual deterioration.

Based on the competent and probative evidence of record, the Board finds that the evidence does not indicate that the Veteran currently suffers from active symptoms related to left eye pterygium. Indeed, the Board finds that the VA examinations in particular are of great probative value, as they were based on thorough examination of the Veteran and consideration of his medical history. Each found that the Veteran's left eye pterygium was asymptomatic. There were no findings that such disability resulted in the loss of visual acuity, disfigurement, conjunctivitis, or any other residual condition. Thus, the Board finds that there is no basis for a compensable rating under Diagnostic Code 6018 (conjunctivitis), nor is a compensable rating warranted pursuant to disfigurement (Diagnostic Code 7800) or the loss of vision in the left eye. 

The Board acknowledges that the Veteran is competent to report symptoms of his left eye. See Barr v. Nicholson, 21 Vet. App. 303 (2007); Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); Layno v. Brown, 6 Vet. App. 465 (1994). In this case, however, the Veteran has not submitted statements to demonstrate left eye symptomatology which has not been considered herein, nor has he reported such symptoms to VA examiners. In fact, in a recent statement dated in April 2014, under the heading "left eye," he indicated decreased vision in the right eye. 

Additionally, he has not been shown competent to identify a specific level of disability according to the appropriate diagnostic code or to attribute any specific left eye symptoms to the service-connected disability. Such competent evidence concerning the nature and extent of the Veteran's service-connected eye disability has been provided by VA medical professionals who have examined him. The medical findings directly address the criteria under which this disability is evaluated. The examiners have also provided clear and uncontroverted opinions that the visual problems that the Veteran experiences are not related to his service-connected left eye disability. The Board finds these reports to be the only competent and probative evidence of record, and therefore such documents are accorded greater weight than the Veteran's subjective complaints of increased symptomatology. See Cartwright v. Derwinski, 2 Vet. App. 24, 25 (1991). 

In evaluating the severity of his service-connected left eye pterygium, the Board also has considered whether the Veteran is entitled to a greater level of compensation for the disability at issue on an extra-schedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors which would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993).

In Thun v. Peake, 22 Vet. App. 111 (2008), the Court addressed at length the extraschedular provisions of 38 C.F.R. § 3.321(b). The Court held that the determination of whether a claimant is entitled to an extraschedular rating is a three-step inquiry. Id. at 115. In Anderson v. Shinseki, 22 Vet. App. 423, 427 (2008), the Court clarified that the Thun steps are, in fact, "elements."

The first step or element is a finding of whether the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Thun, 22 Vet. App. at 115. Therefore, initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. Id. "[I]f the [rating] criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, [and] the assigned schedular evaluation is, therefore adequate, and no referral is required." Id. This task is to be performed by the RO or the Board. Id. 

If the first element is met, the second step or element is a determination of whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Thun, 22 Vet. App. at 116. Such factors include "marked interference with employment" and "frequent periods of hospitalization." Id. This task is also to be performed by the RO or the Board. Id. 

If these two elements are met, the case must be referred to the Under Secretary for Benefits or the Director of Compensation and Pension Service for completion of the third step or element-a determination of whether, to accord justice, the claimant's disability picture requires the assignment of an extraschedular rating. Id. The Court has held that neither the RO nor the Board is permitted to assign an extraschedular rating in the first instance; rather the matter must initially be referred to those officials who possess the delegated authority to assign such a rating. Anderson, 22 Vet. App. at 426 (citing Floyd v. Brown, 9 Vet. App. 88, 95 (1996)).

Neither the first nor second Thun element is satisfied here. The Veteran has not identified any specific symptoms which he contends are related to the disability at issue. The diagnostic codes in the rating schedule which correspond to pterygium provide disability ratings on the basis of visual impairment, which has not been associated with this condition in this case. See 38 C.F.R. § 4.84a, Diagnostic Code 6034. The schedular criteria for Diagnostic Code 6034 contemplate other manifestations of functional loss, such as disfigurement and conjunctivitis, but neither has been demonstrated in this case.

Given the variety of means in which the rating schedule contemplates functional loss for pterygium, the Board concludes that the schedular rating criteria reasonably describe the Veteran's disability picture, which as discussed above, is essentially asymptomatic. In short, there is nothing exceptional or unusual about the Veteran's left eye pterygium because the rating criteria reasonably describe his disability level and symptomatology. Thun, 22 Vet. App. at 115 .

With respect to the second Thun element, the evidence does not suggest that any "related factors" are present. The Board notes that there is absolutely no evidence of record to indicate that the Veteran's left eye pterygium adversely impacts his employability, and the Veteran has not contended otherwise. Furthermore, the Veteran does not contend, and the evidence of record does not suggest, that his left eye pterygium has resulted in frequent periods of hospitalization during the period under consideration. Therefore, the Veteran's service-connected left eye pterygium does not result in marked interference with employment or frequent periods of hospitalization. 38 C.F.R. § 3.321(b)(1). Thus, even if his disability picture was exceptional or unusual, referral would not be warranted.

In denying the Veteran's claim for an increased rating, the Board observes that in Rice v. Shinseki, 22 Vet. App. 447 (2009), the Court held that a claim for TDIU, either expressly raised by the Veteran or reasonably raised by the record, involves an attempt to obtain an appropriate rating for a disability and is part of the claim for an increased rating. In this case, the Board notes that the Veteran was granted entitlement to TDIU in June 2008, and that a claim for TDIU during an earlier period is addressed in the following section. As such, entitlement to a TDIU has been thoroughly addressed during the appellate process.

For these reasons, the Board finds that a preponderance of the evidence is against the Veteran's claim. Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 4.7 (2014).


ORDER

Entitlement to service connection for a dermatological disorder, to include as due to an undiagnosed illness, is denied. 

Service connection for ac acquired psychiatric disorder, MDD, is granted.

Entitlement to an initial, compensable rating for recurrent left eye pterygium is denied.


REMAND

In July 2013, the Board remanded the issue of entitlement to service connection for memory loss, in order to resolve conflicting evidence as to the appropriate diagnoses. In December 2013, a VA examiner diagnosed the Veteran with a mild neurocognitive disorder which was not as likely as not related to military service. In support, the examiner simply noted that there are numerous causes for declines in cognitive ability, with age as the main factor. However, the examiner did not provide an analysis as to why age was the most likely cause for the Veteran's memory loss. Further, the Board notes that a psychiatric disability, MDD, is now service connected, and it should be determined whether loss of cognition is encompassed in the Veteran's psychiatric disability, or whether a separate disorder exists with symptoms wholly separate from that now-service-connected disability. On remand, a supplemental VA opinion should be obtained so as to determine whether a neurocognitive disorder is a stand-alone condition, wholly separate from the Veteran's MDD, and if so, to provide an etiological opinion with a detailed rationale to determine whether such disorder was caused or aggravated by to the Veteran's period of active service, or to his now-service-connected psychiatric disability. If it is determined that other factors such as age are the cause, the examiner must provide a detailed analysis to explain why this is so, as opposed to a causal relationship to a psychiatric disability or service.

With regard to the Veteran's sleep apnea claim, the Board notes that the Veteran reported "Frequent trouble sleeping" on his Report of Medical History at the time of separation examination from his final period of active service in November 1991. At the time of his Gulf War evaluation in 2005, a sleep study was conducted and obstructive sleep apnea was diagnosed. It was further noted that this condition might have a psychiatric component (as it might be due, at least in part, to his depression). An August 2009 VA examination noted a history of obstructive sleep apnea, but no etiological opinion was provided.

In July 2013, the Board remanded this issue for further development. In conjunction with that action, the Veteran was afforded a VA examination in December 2013. The examiner opined that the Veteran's sleep apnea was not related to any of the Veteran's mental conditions, nor his military service. It was noted that obstructive sleep apnea occurred when the nasopharynx or oropharynx collapses passively during inspiration. The examiner went on to say that anatomic factors are more likely causing this veteran's sleep apnea, and this has nothing to do with military service.

Unfortunately, this opinion lacks probative value for multiple reasons. First, there is no evidence of record to rebut the fact that sleep apnea is a disease of anatomic origin. While a theory that the Veteran's mental disorder may contribute to sleep impairment has been raised by the record, the diagnosis of sleep apnea is certainly rooted in physiology. That point has not been contested.

Second, it is not necessary to show that the Veteran's military service caused this disorder. Instead, the evidence merely needs to show that such a disorder had its incurrence during either of the Veteran's periods of active service. As noted above, the Veteran reported frequent trouble sleeping at the time of his separation in 1991. That was not noted by the examiner, nor was any analysis to the origin of his "anatomic disorder" provided. On remand, an addendum opinion must be obtained so as to determine the date of onset/etiology of the Veteran's currently-diagnosed disorder following a complete review of the record, to include the Veteran's service treatment reports and separation examination. If the examiner is not able to provide a medically-probative opinion based on a review of the evidence alone, then a new VA examination in the appropriate specialty must be provided.

Regarding the Veteran's claim for entitlement to service connection for a disorder of the cervical spine, the Board notes that the Veteran is currently service connected for disorders of the left shoulder, elbow, and forearm. His service treatment records are silent as to any cervical spine diagnosis, and his spine was noted to be normal on his November 1991 separation examination. Post-service, he has reported neck pain on several occasions when examined for left shoulder problems, and he has been diagnosed with degenerative disc disease (DDD) of the cervical spine on multiple occasions (2004 and 2009). 

In July 2013, the Board determined that it was conceivable that a disorder of the cervical spine may have been caused, or aggravated beyond normal progression, by his other service-connected orthopedic disabilities. To that end, the Board notes that an additional VA orthopedic examination was provided in December 2013. At that time, the Veteran reported neck pain for the prior 25 years. The examiner noted the prior diagnosis of degenerative arthritis of the spine. Also noted was a series of x-rays obtained in January 2011 which confirmed these degenerative changes in C5-6 and C6-7. 

Following an interview with the Veteran, a review of the claims file, and objective testing, the examiner opined that it was less likely than not that the Veteran's cervical spine disorder was incurred in or proximately due to active duty service. Instead, the examiner determined that the Veteran's cervical spine disorder was most likely age-related. In support, it was noted that the disability picture presented was not consistent with the Veteran's accounts that he had suffered from neck pain since his separation from service. Further, a review of the medical records indicated that the Veteran was not diagnosed with cervical spine DDD until 2011, and that the Veteran himself confirmed this fact. 

While this opinion provided a rationale with regard to direct service connection, it did not provide any rationale as to whether the claimed cervical spine disorder was caused or aggravated by a service-connected disability, to include the left shoulder. Thus, the record still lacks a probative opinion as to whether the Veteran's current claimed diagnosis was caused, or aggravated beyond normal progression, by a service-connected disability. The Board notes that a remand by the Board confers on the veteran, as a matter of law, the right to compliance with the remand. See Stegall v. West, 11 Vet. App. 268 (1998). Here, the requested development was not completed in its entirety. Therefore, an additional remand is warranted to so as to provide the Veteran with a supplemental opinion to address secondary service connection.

As to the remaining disorders at issue, in July 2013, the Board denied the Veteran's claim for entitlement to an initial evaluation in excess of 30 percent for AHD prior to September 15, 2006, and granted entitlement to an initial evaluation of 60 percent from September 15, 2006. The Veteran subsequently appealed that determination to the Court. Per a June 2014 Joint Motion, the Board was found to have erred in not providing an adequate statement of reasons or bases for its findings regarding the appropriate evaluation for AHD, necessitating a remand for consideration of relevant medical evidence, analysis of the appropriate criteria under which to rate the disability, and a determination of whether further development is needed in order to accurately adjudicate the claim. 

The Joint Motion noted that, in February 2005, the Veteran reported to the Columbus VA Medical Center (VAMC) with chest pain. An electrocardiogram (EKG) indicated anterior changes and a possible infarct. That same month, the Veteran reported to the emergency room, per his doctor's instructions, at which times stents were placed. In March 2005, a Cardiology Consult report noted that the tracing of February 2005 revealed what appeared to be a recent anterior infarct, which was a new development since the tracing performed in September 2003. The examiner noted a history of a medium-sized anterior infarct and the placement of two stents. 

Following a September 2006 VA examination, the Veteran was assessed with a mild perfusion defect in the lateral wall, suggesting a prior, mild myocardial infarction. The Veteran underwent a heart catheterization the following month. At that time, the examiner was unable to exclude a prior, mild infarct at the lateral wall.

In its July 2013 determination, the Board indicated that a 100 percent rating was not warranted from September 2006 under the former or revised criteria of Diagnostic Code 7005. However, the Joint Motion points out that the Board failed to discuss the possibility of a myocardial infarction in its analysis. Such a disorder is rated pursuant to Diagnostic Code 7006, in which a total schedular rating is warranted during, and for three months following, a myocardial infarction documented by laboratory tests. It was also suggested that the Veteran's disability may be more properly-rated pursuant to this latter diagnostic code.

The Joint Motion also noted that consideration of entitlement to SMC and TDIU, prior to June 24, 2008, was warranted in this case. The document indicated that SMC was available when, as the result of a service-connected disability, a veteran suffers additional hardships above and beyond those contemplated by VA's schedule for rating disabilities. When a veteran has a service-connected disability rated as total, and an additional service-connected disability (or disabilities) independently ratable at 60 percent or more, then additional monthly compensation shall be at a specified rate. 

The Joint Motion pointed out that an October 2009 rating decision acknowledged that the Veteran had a total service-connected disability that was permanent in nature. This is not entirely accurate. In truth, the RO was referring to the Veteran's award of TDIU, as opposed to one individual disability rated at 100 percent. The Board further points out that such a TDIU rating clearly encompasses the Veteran's aforementioned cardiovascular disability rated at 60 percent, and that, as such, this is not a wholly-separate disability from that aggregate, total rating. It is also noted that, after the 60 percent evaluation for AHD, the next-highest-rated disability stands at 20 percent. However, as the Veteran's cardiac claim is hereby remanded for additional development, so as to determine whether the Veteran suffered from a heart attack during the pendency of this appeal and, if so, when such event(s) took place, the RO shall consider the SMC claim, raised by the Court, following such development.

The issue of entitlement to SMC is therefore inextricably intertwined with the issue of entitlement to higher, initial evaluations for AHD, as addressed above. As such, the Board finds that remanding this issue for contemporaneous consideration is warranted. See Harris v. Derwinski, 1 Vet. App. 180 (1991) (holding that, where a claim is inextricably intertwined with another claim, the claims must be adjudicated together in order to enter a final decision on the matter). 

Finally, the Joint Motion found that the issue of TDIU required additional development. It was noted that the effective date for TDIU was related to the date of the claim therefor and the date entitlement arose. It was also noted that all that is required to support consideration of TDIU within a claim for a higher disability rating is the general intent to seek increased compensation. This fact, coupled with the Board finding that the Veteran is entitled to a 60 percent evaluation for AHD from September 15, 2006, necessities that the issue of entitlement to TDIU prior to June 24, 2008 must be remanded for additional consideration.

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. Copies of updated treatment records should be obtained and added to the claims file.

2. Following completion of the above, forward the entire claims file to the examiner who prepared the December 2013 VA examination report, with regard to the Veteran's mental disorder claims, for a supplemental opinion. If the prior examiner is unavailable, or is unable to render the requested supplemental opinion without examining the Veteran, schedule the Veteran for an additional VA examination, by a VA psychiatrist or psychologist, to answer the questions posed below. The examiner must conduct and note a review of the Veteran's claims file. The examiner should address the following:

a) Is it at least as likely as not (50 percent or greater) that the Veteran's currently-diagnosed neurocognitive disorder is a wholly separate disorder from his now-service-connected psychiatric disability, MDD, with symptoms that are not encompassed by his MDD? If cognitive dysfunction is merely a symptom of the Veteran's psychiatric disorder, the examiner should so indicate.

b) If it is determined that a cognitive disorder is wholly separate from the Veteran's psychiatric disability, is it at least as likely as not (50 percent or greater) that the Veteran's cognitive disorder was aggravated by (i.e. made permanently worse) any service-connected disability (to specifically include a psychiatric disability, MDD). 

If aggravation is found, the examiner should attempt to quantify the degree of additional disability resulting from the aggravation. 

Note: The term "at least as likely as not" does not mean merely within the realm of medical possibility, but rather that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of causation as it is to find against it.

Note: The term "aggravated" in the above context refers to a permanent worsening of the underlying condition, as contrasted to temporary or intermittent flare-ups of symptomatology which resolve with return to the baseline level of disability.

Note: The requested opinions on aggravation should be premised on the baseline level of severity of the disorder before the onset of aggravation, or by the earliest medical evidence created at any time between the onset of aggravation and the examiner's current findings.

A rationale for any opinion expressed must be provided. 
If no opinion can be rendered without resorting to pure speculation, the examiner should explain why this is so. In so doing, the examiner shall explain whether the inability to provide a more definitive opinion is the result of a need for additional information or that he or she has exhausted the limits of current medical knowledge in providing an answer to that particular question.

3. Following completion of the development requested in paragraph 1, above, forward the entire claims file to the examiner who prepared the December 2013 VA examination report, with regard to the Veteran's sleep apnea claim, for a supplemental opinion. If the prior examiner is unavailable, or is unable to render the requested supplemental opinion without examining the Veteran, schedule the Veteran for an additional VA examination, by an examiner with the appropriate expertise, to answer the question posed below. The examiner must conduct and note a review of the Veteran's claims file. Specifically, the Veteran's 1991 Report of Medical History noting frequent trouble sleeping must be discussed. The examiner should address the following:

Whether it is at least as likely as not (50 percent or greater probability) that the Veteran's current diagnosis of sleep apnea had its onset during active service. 

Note: The term "at least as likely as not" does not mean merely within the realm of medical possibility, but rather that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of causation as it is to find against it.

A rationale for any opinion expressed must be provided. 
If no opinion can be rendered without resorting to pure speculation, the examiner should explain why this is so. In so doing, the examiner shall explain whether the inability to provide a more definitive opinion is the result of a need for additional information or that he or she has exhausted the limits of current medical knowledge in providing an answer to that particular question.

4. Following completion of the development requested in paragraph 1, above, forward the entire claims file to the examiner who prepared the December 2013 VA examination report, with regard to the Veteran's cervical spine claim, for a supplemental opinion. If the prior examiner is unavailable, or is unable to render the requested supplemental opinion without examining the Veteran, schedule the Veteran for an additional VA examination, by an examiner with the appropriate expertise, to answer the question posed below. The examiner must review the claims file and that review must be noted in the report. The examination report should include discussion of the Veteran's documented medical history and assertions. The examiner should answer the following:

Whether it is at least as likely as not (50 percent or greater probability) that the Veteran's cervical spine disorder was caused or aggravated (increased in severity beyond the normal course of the condition) by any service-connected disability, to include a shoulder disability. 

If aggravation is found, the examiner should attempt to quantify the degree of additional disability resulting from the aggravation. 

Note: The term "at least as likely as not" does not mean merely within the realm of medical possibility, but rather that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of causation as it is to find against it.

Note: The term "aggravated" in the above context refers to a permanent worsening of the underlying condition, as contrasted to temporary or intermittent flare-ups of symptomatology which resolve with return to the baseline level of disability.

A complete rationale for the requested opinion, accompanied by supporting medical data and analysis, must be provided. If the examiner cannot provide an opinion without resorting to mere speculation, he or she shall provide a complete explanation stating why this is so. In so doing, the examiner shall explain whether the inability to provide a more definitive opinion is the result of a need for additional information or that he or she has exhausted the limits of current medical knowledge in providing an answer to that particular question.

5. Following completion of the development requested in paragraph 1, above, obtain a VA examination in the appropriate specialty to determine the current nature and extent of the Veteran's service-connected AHD, as well as whether the Veteran has suffered a myocardial infarction (or infarctions) at any time during the pendency of this appeal. All indicated tests should be accomplished. 
The claims file, to include a copy of this Remand as well as the June 2014 Joint Motion, must be made available to and be reviewed by the examiner. The examiner is asked to:

a) Identify any occurrence (with as much specificity as possible, to the exact date, if at all possible) of a myocardial infarction during the appellate period which is documented by laboratory tests. 

b) If any episode of myocardial infarction is confirmed, opine as to whether the Veteran has suffered, or currently suffers, from chronic congestive heart failure.

c) If congestive heart failure is found currently, or within any time in the appellate period, discuss the workload (in METs) and ejection fraction for each period, to the extent possible.

d) For any such period, determine whether the Veteran's congestive heart failure was manifested by dyspnea, fatigue, angina, dizziness, syncope, left ventricular dysfunction, cardiac hypertrophy, or dilation, or whether such disorder requires continuous medication.

e) For the appellate period prior to June 24, 2008, without regard to the Veteran's age or the impact of any non-service-connected disabilities, comment on functional impairment caused solely by the service-connected disabilities. The Veteran's age and nonservice-connected disabilities should not be discussed or considered.

Note: The term "at least as likely as not" does not mean merely within the realm of medical possibility, but rather that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of causation as it is to find against it.

6. After completing the above action, and any other indicated development, the Veteran's issues remaining on appeal should be readjudicated. Attention is directed to the June 2014 Joint Motion. If any benefit remains denied, a supplemental statement of the case must be provided to the Veteran and his representative. After the Veteran and his representative have had an adequate opportunity to respond, the appeal must be returned to the Board for further appellate review, if in order.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
BARBARA B. COPELAND
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs